# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**LARRY BANKHEAD,**

        **Plaintiff,**

**v.**

**JO ANNE B. BARNHART,**
**Commissioner of Social Security,**

        **Defendant.**

        **Civil Action No. 2:04CV59**
        **(Judge Robert E. Maxwell)**

## REPORT AND RECOMMENDATION/OPINION

This is an action for judicial review of the final decision of the defendant Commissioner of the Social Security Administration ("Defendant" and sometimes "Commissioner") denying the Plaintiff's claim for supplemental security income benefits ("SSI") under Title XVI of the Social Security Act. The matter is awaiting decision on Plaintiff's Motion for Judgment on the Pleadings and Defendant's Motion for Summary Judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

## I. PROCEDURAL HISTORY

Larry Bankhead ("Plaintiff") protectively filed his application for Supplemental Security Income ("SSI") benefits on March 26, 2001, alleging disability beginning March 30, 1989, due to neck, back, and chest pains, "breathing problems from smoking," high blood pressure, diabetes, and "pinched nerves in back" (R. 70). The application was denied initially and on reconsideration (R. 43, 45). Plaintiff requested a hearing, which Administrative Law Judge ("ALJ") Jay Levine held on July 23, 2002 (R. 617). Plaintiff, represented by counsel, testified on his own behalf, along with

Vocational Expert Larry Ostrowski ("VE"). By decision dated September 24, 2002, the ALJ denied benefits (R. 16). The Appeals Council denied Plaintiff's request for review on June 22, 2004, rendering the ALJ's decision the final decision of the Commissioner (R. 9).

## II. FACTS

Plaintiff was born on December 27, 1954, and was 47 years old when the ALJ issued his decision (R. 16, 60). Plaintiff has an eighth-grade education. Records show he attended special education classes. He has past employment as a general laborer and a gas station attendant. For a short time he had his own business as a carpet installer (R. 624). He had not performed any substantial work in the past 15 years, and therefore has no past relevant work.

The record shows Plaintiff was injured in 1985 due to a fall from a ladder at work (R. 253). He injured his back, neck, right arm, and wrist. It appears from the record that he was not covered under Worker's Compensation at the time.

In February 1995, Plaintiff complained of some difficulty breathing, associated with soreness and pain in the left chest (R. 284). He also complained of low back pain. A chest x-ray was normal (R. 283). He was advised to stop smoking and lose weight. He was diagnosed with acute bronchitis, obesity, and borderline hypertension.

In 1996, Plaintiff was diagnosed with atypical chest pain, heavy smoking with probable early emphysema, borderline diabetes- diet controlled, and musculoskeletal complaints (R. 245). Chest x-rays showed no acute lung or pleural pathology, but a mild degree of chronic interstitial changes were noted bilaterally (R. 250). Plaintiff smoked two to three packs of cigarettes per day.

In August 1996, plaintiff was diagnosed with acute lower cervical mid-dorsal spine area strain, brachial neuritis of the left shoulder and left upper extremity, and acute right iliac area strain

and sprain (R. 253). He also complained of sweats, dizziness, loss of sleep, fatigue, nervousness, numbness and pain in his left arm, failing vision, spots before his eyes, sore throat, sinus infection, nasal drainage, chronic cough, chest pain, breathing difficulties, difficult swallowing, rapid heartbeat, pain in chest, stiff neck, back ache, pain between the shoulders, and gas.

On August 20, 1996, Plaintiff's doctor noted Plaintiff did not keep his second appointment and did not follow his plan of treatment (R. 253).

X-rays in December 1996, showed normal dorsal spine and shoulder, but focal hypertrophic spurring of the cervical spine with no acute abnormalities (R. 287).

Plaintiff was in a car accident in January 1997, in which he hurt his back and neck (R. 314).

In February 1997, Plaintiff presented to his doctor with complaints of chest pain (R. 314). Upon examination, he was obese, slightly pale, had decreased range of motion and some tenderness in the left neck, had few bilateral wheezes, and had degenerative changes in the extremities. He was diagnosed with chest pain, anxiety, and hypertension.

On February 28, 1997, an MRI of the lumbar spine showed minimal bulging of the T12-L1 disc anterior to the vertebral body (R. 256). MRI of the cervical spine showed minimal bulging at C2-3; mild-to moderate central bulging of the disc at C3-4; moderate focal central impress on the thecal sac due to central disc bulge/herniation at C4-5; mild central bulging of the disc at C5-6; and mild diffuse bulging of the disc at C6-7 (A. 257). The doctor noted Plaintiff had a relatively small diameter of the spinal canal with relatively little subarachnoid space to the thecal sac. He diagnosed relatively small AP diameter of the spinal canal; mild-to-moderate ventral impress on the thecal sac at 3-4, 5-6, and 6-7, and moderate focal ventral impress at 4-5.

Also in about 1997, Plaintiff, still a three-pack a day smoker, began complaining of chronic

3

throat pain (R. 126). He was seen by James E. Bland, M.D., who diagnosed chronic laryngitis and performed suspension microlaryngoscopy and right vocal cord stripping and continuously advised Plaintiff to quit smoking.

In June 1997, neurologist James Weinstein, M.D. read Plaintiff's films and opined there was "certainly consideration for indication of cervical surgery," but Plaintiff thought his lower back problem was worse. Dr. Weinstein was reluctant "to endeavor on a series or even a single two-level cervical procedure when the patient has so much symptomology which won't be effected whatsoever by such surgery." He therefore recommended conservative treatment, with neck and back exercise and walking.

Throughout 1997, 1998, and 1999, Plaintiff continued to treat for complaints of, among others, back and neck pain, chest pain, chest congestion, cough, hypertension, pharyngitis, laryngitis, face numbness, etc. He was also diagnosed throughout this period with nicotine addiction, obesity, hypertension, pharyngitis, and insomnia.

In August 1999, Plaintiff's physician completed a physical examination for the State Department of Health and Human Services (R. 426). The physician opined that Plaintiff was obese, suffered from depression, had bulging discs at T12 - L1, C2-3, C4-5, and had back pain. The State agency found Plaintiff was disabled (R. 427).

In August 2000, Plaintiff had another motor vehicle accident (R. 230). He presented to the hospital with complaints of neck pain.. An x-ray showed large osteophytes and degenerative changes in the lower cervical spine, but no acute abnormality. He was diagnosed with cervical pain and strain.

Plaintiff presented to the hospital clinic in January 2001, for complaints of pain in his left jaw and neck, worse after eating (R. 229). His cholesterol was 379. He was not on medication. He was

diagnosed with diabetes recently diagnosed; H. Pylori gastritis; high cholesterol; and sleep apnea.

On March 26, 2001, Plaintiff presented to the hospital clinic with complaints of intermittent pain in his lower back, left groin, and hip, with chronic pain in the back of his neck, and chronic pain in his left chest, shoulder, and neck (R. 227). He was diagnosed with elevated LFT's, chronic back pain, and depression, and was prescribed Valium and Paxil.

On April 12, 2001, Plaintiff still complained of pain in his left jaw and face, sore throat, and lightheadedness (R, 226). He said the Paxil helped the depression symptoms. A chest x-ray showed infiltrate in the right lower lobe. Plaintiff was diagnosed with infiltrate of the right lower lobe, uncontrolled hypertension, diabetes, and anxiety.

Also in 2001, Dr. Bland diagnosed chronic pharyngitis and again "strongly recommend[ed] discontinuation of smoking" (R. 125).

An April 26, 2001, chest x-ray showed slight improvement of Plaintiff's lungs, but still persistent right lower lobe infiltrate (R. 237). Plaintiff presented to the clinic for a followup (R. 225). His lungs had slowly started to improve, and his blood pressure had markedly improved.

On June 12, 2001, Plaintiff was examined by Rodolfo Gobunsuy, M.D., at the request of the State agency (R. 127). Plaintiff's chief complaints were shortness of breath and pain in his neck and lower back. He stated he hurt his neck and back more than 15 years ago while working. He also complained of cough and shortness of breath with blackout spells and off and on wheezing. He had diet controlled diabetes, hypertension, history of depression, H. Pylori, gastritis, and abnormal liver function tests (R. 128). He was taking Accupril, Motrin, Paxil, and Valium.

Upon examination Plaintiff was 5'9" and weighed 228 pounds (R. 128). His blood pressure was 110/74. He was comfortable sitting and supine, and walked steadily without obvious antalgia.

The lungs revealed diminished air entry with few wheezes. There was no prolongation of expiratory phase. He was huffing and puffing during the examination. The abdomen was obese. He had early clubbing of the fingernails, (most often noted in heart and lung diseases that cause decreased blood oxygen),[1] but no other clubbing, cyanosis, or edema. He was able to walk on heels, toes, heel-to-toe, and squat. He could stand on one leg at a time. He could write, button, and pick up coins with either hand without difficulty.

Plaintiff's spine curvature was normal (R. 130). The cervical spine was not tender, but there was paracervical muscle spasm. The thoracolumbar spine was not tender, but there was paralumbar muscle spasm. The left leg was smaller circumferentially than the right, suggesting he was favoring his left leg. The lower back was not tender and straight leg raising was negative. Plaintiff's range of motion of the neck was decreased.

A lumbar spine x-ray that same date showed narrowing of L5-S1; osteoarthritic changes of L2, 3, and 4; and degenerative arthrosis of the lower dorsal spine (R. 134). There was no collapse and the sacroiliac joints were normal.

Ventilatory Function Tests that same date indicated moderate COPD with moderate restrictive disease, with significant improvement after bronchodilation (R. 135).

A chest x-ray on June 22, 2001, showed continued right lower lobe infiltrate (R. 238). A chest CT was advised, and malignancy could not be excluded.

A chest x-ray and CT on June 25, 2001, showed no improvement (R. 239). It showed a

---

[1]

MedlinePlus [Internet]. Bethesda (MD): National Library of Medicine (US); [updated 2006 May 3]. Diffuse Interstitial Lung Disease [updated May 3, 2006; reviewed July 24, 2006; cited 2006 July 24]. Available from: http://www.nlm.nih.gov/medlineplus/ency/article/000128.html

parenchymal lesion. The doctor recommended bronchoscopy.

On July 18, 2001, State agency reviewing physician L. Dale Simmons completed a Residual Functional Capacity Assessment ("RFC"), opining Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand/walk about six hours in an eight-hour workday, and sit about six hours in an eight-hour workday (R. 141). He could occasionally perform all posturals. Dr. Simmons opined that Plaintiff's RFC should be reduced to "light" based on his COPD and degenerative arthritis.

On July 19, 2001, John A. Bellotte, M.D. wrote to Plaintiff's doctor Tom Lauderman, DO (R. 148). He informed Dr. Lauderman that upon examination, Plaintiff's lungs had decreased breath sounds and rales in the right base. His back was nontender. Extremities showed no cyanosis, clubbing, or edema. Chest x-rays showed a four centimeter right infrahilar mass and a 1.5 centimeter lymph node and his pulmonary functioning test revealed decreased FVC suggesting a mild restrictive ventilatory impairment along with a severe obstructive ventilatory impairment, not significantly responsive to bronchodilator medication by this testing.

Dr. Bellotte opined that Plaintiff had tussive syncope (R. 149). Dr. Bellotte wanted to perform a flexible fiberoptic bronchoscopy but was "uncomfortable" doing so without some sort of cardiac clearance, because Plaintiff had "an amazing array of risk factors for cardiac disease plus an amazing array of multiple medical problems." (R. 150).

On August 6, 2001, Plaintiff presented to the clinic in order to get a cardiac workup for his bronchoscopy (R. 222). He continued to smoke three packs per day.

On September 27, 2001, it was noted that Plaintiff was controlling his blood sugar with diet (R. 220). He could tell when it was elevated and watched more closely. He had stopped smoking

7

two weeks earlier. His hypertension was stable on medications and his diabetes was controlled with diet. It was noted he had a lung lesion.

On October 4, 2001, Plaintiff was still not smoking and his diabetes was still controlled. His hypertension was still poorly controlled. He also complained of numbness with tingling in the side of his face.

On October 29, 2001, Plaintiff underwent Pulmonary Function Tests and Spirometry to rule out lung cancer (R. 388). The results were considered abnormal with moderate expiratory air flow obstruction; no restrictive defect; mild air trapping; no diffusion defect; and abnormal flow volume loop. There was significant post-bronchodilator improvement. The doctor commented that the results showed reversible airway obstruction with chest bellows disease.

On November 2, 2001, Plaintiff complained of sinus drainage, sore throat, and cough (R. 350). Upon examination he had harsh breath sounds. He was diagnosed with diabetes, bronchitis, and lung cancer. It was noted he had not been taking his sugar pills as directed.

On November 5, 2001, Plaintiff saw Juan D'Brot, M.D. upon his admission to the hospital for lung carcinoma/right lung mass/decompensated chronic obstructive pulmonary disease (R. 391). Physical examination indicated Plaintiff was obese, with wheezes, and trace edema. The pre-surgery diagnoses were lung mass, rule out neoplasia; chronic obstructive pulmonary disease, decompensated; and coronary artery disease.

On November 5, 2001, Plaintiff underwent a right thoracotomy for "probable bronchogenic carcinoma of the right lower lobe" (R. 349). The mass turned out to be benign (R. 153). There was no sign of malignancy. Plaintiff did "remarkably well" following surgery.

On December 14, 2001, State agency reviewing psychologist Samuel Goots, Ph.D. completed

a Psychiatric Review Technique ("PRT") opining that there was insufficient evidence of any mental impairment (R. 195).

On December 14, 2001, State agency reviewing physician Fulvio Franyutti, M.D., completed an RFC opining Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand/walk about six hours in an eight-hour workday, and sit about six hours in an eight-hour workday (R. 210). He was limited to occasional postural movements. He was to avoid concentrated exposure to extreme cold and heat and hazards (R. 213). Dr. Franyutti reduced plaintiff's RFC to light based on his pulmonary disease, pain, and fatigue.

A December 15, 2001, chest x-ray showed slight prominence of the right hilar region that could represent neoplastic changes, and degenerative changes of the dorsal spine (R. 240).

On December 20, 2001, Sulaiman B. Hasan, M.D., wrote a letter stating that Plaintiff had recently undergone a right thoracotomy to rule out cancer, and also suffered from obesity. He stated that Plaintiff had significant discomfort from the thoracotomy incision and that is was unlikely that he would be able to do heavy lifting or construction work in the future (R. 217).

On January 23, 2002, Plaintiff complained of inability to sleep due to severe neck pain (R. 375). He had begun smoking again. He was diagnosed with musculoskeletal cervical sprain and cough status post lung surgery. He was again urged to discontinue smoking.

On February 8, 2002, Plaintiff underwent follow-up pulmonary functioning tests (R. 410). It was noted he had smoked just two minutes before testing. Spirometry revealed reduced FEV1 and FEV1/FVC ration consistent with severe obstructive defect, and decreased FVC consistent with air trapping or additional restrictive process. There was again significant response to inhaled bronchodilators. Compared with previous studies Dr. D'Brot found there had been worsening of the

9

obstructive defect. There remained evidence of reversible airway obstruction and chest bellows disease.

On February 14, 2002, Physician's Assistant Debbie Blake wrote a letter stating that Plaintiff was having some pain and neurological symptoms from his surgery that would probably persist for an extended period of time. She noted Plaintiff also had COPD and diabetes and sleep apnea, and battled high blood pressure. She opined it was quite unlikely at the time that he was able to work at the employment he once did (R. 218).

A chest x-ray that same date showed slight infiltrate at the right base with disc atelectasis (R. 134).

On March 18, 2002, lumbar spine x-rays indicated minimal degenerative changes (R. 360).

On April 5, 2002, Plaintiff underwent a mental evaluation at the request of the State agency, performed by Morgan Morgan, M.A. (R. 261). Upon mental status examination Plaintiff was cooperative and compliant. Eye contact was fair. He had normal spontaneity. Length and depth of verbal responses were normal. He appeared extroverted. His speech was relevant, coherent, and at a normal pace. He was fully oriented. His observed mood appeared mildly dysphoric and somewhat tense. His affect was normal. He denied any thought disorder and no symptoms were observed. His insight appeared fair; his judgment was deemed average; his memory was fair to normal; and his concentration appeared average. His motor behavior appeared mildly retarded and he appeared quite tense and rigid at times.

Plaintiff's IQ was 82 verbal, 80 performance, and 79 full scale (R. 264). Mr. Morgan believed this was an underestimate of Plaintiff's intellectual functioning due to mood symptoms he was experiencing. He tested at grade 5 in reading, 3 in spelling, and 4 in arithmetic, which Mr.

Morgan found were a fair estimate based on Plaintiff's reported special education and poor academic functioning. It appeared he suffered from some type of learning disability.

Plaintiff reported arising at 9:00 am and spending most of the day at home (R. 265). His wife helped him bathe, but he could otherwise maintain his own personal hygiene. He occasionally washed some dishes. He drove and watched television. He had a small social network including friends, his wife and son, and his in-laws. His interaction with the staff was within normal limits. Plaintiff reported getting along fairly well with people, although his mood symptoms caused some irritability.

Objectively, Plaintiff's motor behavior seemed somewhat retarded and his mood dysphoric (R. 265). His mood did brighten during the assessment and he displayed a sense of humor. Although the assessment indicated a learning disability, it did not make clear whether it was within all areas or just a general level of poor academic functioning. Plaintiff's concentration was normal, his persistence poor, and his pace moderately slow (R. 265). His memory was within normal limits. Mr. Morgan diagnosed panic disorder without agoraphobia, adjustment disorder with depressed mood, and learning disability NOS.

Mr. Morgan completed a "Medical Source Statement of Ability to do Work-Related Activities (Mental)," opining that Plaintiff would have a marked limitation on his ability to understand, remember, and carry out detailed instructions; interact appropriately with supervisors; interact appropriately with coworkers; respond appropriately to work pressures in a usual work setting; and respond appropriately to changes in a routine work setting. He would have a moderate limitation in his ability to interact appropriately with the public and a slight limitation on his ability to understand, remember, and carry out simple instructions (R. 267-278).

Plaintiff was examined on April 12, 2002, for suspicion of sleep apnea (R. 413). He underwent a sleep study on May 6, 2002 (R. 417). The impression was obstructive apneas and hypopneas with desaturation, and snoring at level 7 (8 being the maximum).

On May 30, 2002, Plaintiff's doctor wrote a note stating that Plaintiff should not wear a shoulder belt due to severe intercostal neuralgia of the chest wall status post thoracotomy (R. 430).

On June 21, 2002, Plaintiff complained of stomach pain with diarrhea (R. 552). His doctor diagnosed GERD, noting a positive test for H. Pylori.

On June 24, 2002, Robert Mace, M.D., Plaintiff's treating physician, completed an RFC noting Plaintiff had chronic back and neck pain, fibrosis of the lungs, diabetes, hypertension, anxiety and depression, and a learning disability (R. 432). He opined it would be advisable for Plaintiff to recline or lie down with his feet up during the day and advisable or necessary for him to have frequent rest periods. He would experience chronic moderate pain and intermittent severe pain. He also opined, however, that Plaintiff could work full time at a sedentary position if retrained, possible in an office-type job (R. 437). He could stand 10-15 minutes at a time, walk 10-15 minutes at a time, and stand/walk a total of two hours in an eight-hour day, but must be able to change positions frequently.

Cervical spine x-rays on August 12, 2002, indicated:

There is fusion of the lower cervical vertebral bodies from C5-C7 by multiple bridging anterior osteophytes and the remainder of the cervical spine also demonstrates anterior osteophytes.

(R. 573).

Plaintiff presented to the hospital on September 16, 2002, complaining of cough and congestion in his head and chest (R. 560). He was diagnosed with bronchitis, diabetes, and arthritis.

12

Plaintiff presented to the hospital on December 6, 2002, with complaints of headaches and nosebleeds; arms and leg pain; and pain in right shoulder (R. 561). The doctor scheduled a CT scan of the jaw, and diagnosed myalgias, jaw pain, diabetes, and sinusitis.

On June 9, 2003, Plaintiff complained of an increase in his head, neck, shoulder, and arm pain (R. 574). Examination showed decreased range of motion in the cervical spine. X-rays showed extensive anterior osteophytes from C1 to C7 without evidence of fracture, possibly due to osteoarthritis, degenerative changes, diffusely idiopathic skeletal hyperostosis or other systemic arthritis (R. 584).

On August 7, 2003, plaintiff complained of right shoulder and back pain (R. 575). He stated his pain was tolerable on Celebrex.

### III. ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 416.920 (1997), ALJ Levine made the following findings:

1. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

2. The claimant's emphysema, low back pain, noninsulin dependent diabetes mellitus, sleep apnea, depression, and pharyngitis are severe impairments, based upon the requirements in the Regulations (20 CFR § 416.921).

3. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

4. I find the claimant's allegations regarding his work-related limitations are not totally credible for the reasons set forth in the body of the decision.

5. I have carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR § 416.927).

6.  The claimant has the following residual functional capacity: to perform at the sedentary exertional level. The claimant is able to lift no more than ten pounds at a time and occasional lifting/carrying articles like docket files, ledgers, and small tools. The claimant is able to occasionally walk and stand and is able to sit, but requires a sit/stand option at will. The claimant can occasionally stoop, kneel, and crouch, but is precluded from climbing, balancing, and crawling. The claimant must not be required to raise his voice to speak in a noisy environment. The claimant must avoid temperature extremes, fumes, dust, odors, and gases, and hazards, such as moving machinery or unprotected heights. The claimant is limited to performing only simple, routine, repetitive work tasks within a low stress environment.

7.  The claimant has no past relevant work (20 CFR § 416.965).

8.  The claimant is a "younger individual between the ages of 45 and 49" (20 CFR § 416.963).

9.  The claimant has "a limited education" (20 CFR § 416.964).

10. Although the claimant's exertional and nonexertional limitations do not allow him to perform the full range of sedentary work, using Medical-Vocational Rule 201.18 as a framework for decision-making, there are a significant number of jobs in the national economy that he could perform. Examples of such jobs include work as an assembler, of which there are 62 jobs locally and 103,800 jobs nationally, a surveillance system monitor, of which there are 8 jobs locally and 5,460 nationally, a messenger, of which there are 13 jobs locally and 6,900 jobs nationally, and a cashier, of which there are 206 jobs locally and 141,700 jobs nationally.

11. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 416.920(f)) (R. 26-27).

## IV. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v.

14

NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990), (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Secretary's decision, the reviewing court must also consider whether the administrative law judge applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Supplemental Brief

As a threshold matter, on March 9, 2005, the Court entered an Order dismissing Plaintiff's case for failure to prosecute and for failure to comply with the Court's November 22, 2004, Order, in that Plaintiff did not file his motion for summary judgment by January 24, 2005 [Docket Entry 9]. On March 22, 2005, Plaintiff filed a motion to vacate the March 9, 2005, Order, and for Reconsideration of Plaintiff's Motion for Judgment on the Pleadings, which was attached thereto. In this Motion, counsel for Plaintiff expressly represented to the Court that the Motion for Judgment on the Pleadings "was stamped, mailed and postmarked to the Court on the 24th day of January, 2005, all as indicated by certified mail, return receipt, as attached hereto and made apart hereof and Plaintiff's Exhibit 1." On March 24, 2005, counsel for Plaintiff filed an Amended Motion, apologizing to the Court, and representing that she had located the certified mail receipt and that it indicated the Motion for Judgment on the Pleadings was actually mailed February 2, 2005, not January 24, 2005, as was initially asserted.

In either case, counsel for Plaintiff clearly represented to the Court that the Motion and Brief in Support had been filed before the Order dismissing the case was entered. There was no

representation that the Brief was in some way incomplete or insufficient. The undersigned therefore

ORDERED on September 30, 2005, that, although he recommended the case be reopened, the case

was fully briefed and no further submissions would be filed.

Plaintiff objected solely to the disallowance of a supplemental submission. The District

Judge, on January 23, 2006, adopted the undersigned's Report and Recommendation and reopened

the case. The District Judge, however, left the matter of any supplemental submissions to the

undersigned.

The undersigned has already determined that no further submissions would be permitted in

this matter, and does not reconsider that determination. The undersigned therefore has not

considered Plaintiff's Supplemental Brief or Defendant's Response thereto.

### C. Contentions of the Parties

Plaintiff contends:

1.  The ALJ failed to evaluate and consider the treating source opinion and explain the weight given to such opinion evidence. Pursuant to the provision of 20 CFR 416.927, SSR 96-2p and 96-5p.

2.  That the ALJ improperly substituted his own opinion for that of trained medical and mental health professionals who had examined the claimant and summarily rejected their medical opinion, except for selective references used out of context.

3.  The ALJ failed to consider all of the mental and physical impairments documented in the record and concomitantly failed to consider the combined affect [sic] of those impairments. Delotache [sic] vs. Heckler, 715 F.2d 148 (4th cir. [sic] 1983) and Walker vs. Bowen, 889 F.2d 47 (4th Cir. 1988).

4.  The ALJ did not follow the dictates of SSR 96-7p when determining the issues of credibility and pain.

5.  The ALJ ignored the fully favorable testimony of the VE, all of which supports a finding that Plaintiff was disabled.

The Commissioner contends:

1.     The medical evidence supports the ALJ's finding that Plaintiff's impairments did not prevent him from working.

2.     The ALJ properly concluded that Plaintiff's subjective symptoms were not entirely credible.

3.     The limitations the ALJ included in his hypothetical question posed to the VE are supported by the record.

For purposes of clarity and efficiency, the undersigned addresses the parties' contentions out of order.

## D. Severe Impairments

Plaintiff argues that the ALJ failed to consider all the impairments documented in the record and as a result also failed to consider the combined effect of those impairments. The ALJ concluded Plaintiff had emphysema, low back pain, noninsulin dependent diabetes mellitus, sleep apnea, depression, and pharyngitis (R. 22). He also found these impairments were severe. The ALJ failed to find severe other impairments including obesity, cervical pain and limitations, COPD, chronic bronchitis, hypertension, high cholesterol, panic disorder, adjustment disorder, learning disability, GERD, fibrosis of the lungs or arthritis.[2] The Fourth Circuit has held:

> '[A]n impairment can be considered as "not severe" only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience.' " *Brady v. Heckler,* 724 F.2d 914, 920 (11th Cir.1984) (*quoting Appeals Council Review of Sequential Evaluation Under Expanded Vocational Regulations* (1980) (emphasis added).

Evans v. Heckler, 734 F.2d 1012 (4th Cir. 1984). The undersigned in particular finds substantial evidence does not support the ALJ's failure to find Plaintiff's obesity and cervical limitations to be

_____

[2]This list is not intended to be exhaustive.

severe impairments. Plaintiff was clearly and continuously diagnosed with obesity. It is therefore at the least a medically determinable impairment. The ALJ, however, never discussed Plaintiff's obesity. Social Security Regulation 00-2p states that the Commissioner shall consider obesity throughout the sequential evaluation, as follows:

[1] We will consider obesity in determining whether:

> The individual has a medically determinable impairment;
>
> The individual's impairment(s) is severe;
>
> The individual's impairment(s) meets or equals the requirements of a listed impairment in the listings; [and]
>
> The individual's impairment(s) prevents him or her from doing past relevant work and other work that exists in significant numbers in the national economy.

[2] How Is Obesity Identified as a Medically Determinable Impairment?

> When establishing the existence of obesity, we will generally rely on the judgment of a physician who has examined the claimant and reported his or her appearance and build, as well as weight and height. Thus, in the absence of evidence to the contrary in the case record, we will accept a diagnosis of obesity given by a treating source or by a consultative examiner. However, if there is evidence that indicates that the diagnosis is questionable and the evidence is inadequate to determine whether or not the individual is disabled, we will contact the source for clarification, using the guidelines in 20 CFR 404.1512(e) and 416.912(e).

[3] When Is Obesity a "Severe" Impairment?

> As with any other medical condition, we will find that obesity is a "severe" impairment when, alone or in combination with another medically determinable physical or mental impairment(s), it significantly limits an individual's physical or mental ability to do basic work activities. . . . . We will also consider the effects of any symptoms (such as pain or fatigue) that could limit functioning . . . . Therefore, we will find that an impairment(s) is "not severe" only if it is a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the individual's ability to do basic work activities . . . .
>
> There is no specific level of weight or BMI that equates with a "severe" or a "not severe" impairment. Neither do descriptive terms for levels of obesity (e.g., "severe,"

"extreme," or "morbid" obesity) establish whether obesity is or is not a "severe" impairment for disability program purposes. Rather, we will do an individualized assessment of the impact of obesity on an individual's functioning when deciding whether the impairment is severe.

[4] How Do We Evaluate Obesity at Step 3 of Sequential Evaluation, the Listings?

Obesity may be a factor in both "meets" and "equals" determinations.

Because there is no listing for obesity, we will find that an individual with obesity "meets" the requirements of a listing if he or she has another impairment that, by itself, meets the requirements of a listing. We will also find that a listing is met if there is an impairment that, in combination with obesity, meets the requirements of a listing. For example, obesity may increase the severity of coexisting or related impairments to the extent that the combination of impairments meets the requirements of a listing. This is especially true of musculoskeletal, respiratory, and cardiovascular impairments. It may also be true for other coexisting or related impairments, including mental disorders . . . .

We will also find equivalence if an individual has multiple impairments, including obesity, no one of which meets or equals the requirements of a listing, but the combination of impairments is equivalent in severity to a listed impairment. For example, obesity affects the cardiovascular and respiratory systems because of the increased workload the additional body mass places on these systems. Obesity makes it harder for the chest and lungs to expand. This means that the respiratory system must work harder to provide needed oxygen. This in turn makes the heart work harder to pump blood to carry oxygen to the body. Because the body is working harder at rest, its ability to perform additional work is less than would otherwise be expected. Thus, we may find that the combination of a pulmonary or cardiovascular impairment and obesity has signs, symptoms, and laboratory findings that are of equal medical significance to one of the respiratory or cardiovascular listings.

However, we will not make assumptions about the severity or functional effects of obesity combined with other impairments. Obesity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment. We will evaluate each case based on the information in the case record.

[5] How Do We Evaluate Obesity in Assessing Residual Functional Capacity ?

Obesity can cause limitation of function. The functions likely to be limited depend on many factors, including where the excess weight is carried. An individual may have limitations in any of the exertional functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling. It may also affect ability to do postural functions, such as climbing, balance, stooping, and crouching. The ability to

manipulate may be affected by the presence of adipose (fatty) tissue in the hands and fingers. The ability to tolerate extreme heat, humidity, or hazards may also be affected.

The effects of obesity may not be obvious. For example, some people with obesity also have sleep apnea. This can lead to drowsiness and lack of mental clarity during the day. Obesity may also affect an individual's social functioning.

An assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment. Individuals with obesity may have problems with the ability to sustain a function over time . . . . In cases involving obesity, fatigue may affect the individual's physical and mental ability to sustain work activity. This may be particularly true in cases involving sleep apnea.

The combined effects of obesity with other impairments may be greater than might be expected without obesity. For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone.

. . . .

As with any other impairment, we will explain how we reached our conclusions on whether obesity caused any physical or mental limitations.

A review of the ALJ's decision clearly indicates he did not even consider Plaintiff's diagnosed obesity, much less perform the above-referenced analysis. For this reason alone the undersigned finds substantial evidence does not support the ALJ's determination.

Additionally, there is a great deal of objective medical evidence indicating Plaintiff had a severe cervical impairment. As far back as 1997, an MRI showed minimal bulging at C2-3; mild-to moderate central bulging of the disc at C3-4; moderate focal central impress on the thecal sac due to central disc bulge/herniation at C4-5; mild central bulging of the disc at C5-6; and mild diffuse bulging of the disc at C6-7 (A. 257). The doctor noted Plaintiff had a relatively small diameter of the spinal canal with relatively little subarachnoid space to the thecal sac. He diagnosed relatively small AP diameter of the spinal canal; mild-to-moderate ventral impress on the thecal sac at 3-4, 5-6, and 6-7, and moderate focal ventral impress at 4-5. Examinations indicated Plaintiff had spasm and

decreased range of motion of the cervical spine. By 2002, studies showed Plaintiff had "fusion of the lower cervical vertebral bodies from C5-C7 by multiple bridging anterior osteophytes and the remainder of the cervical spine also demonstrates anterior osteophytes."

The undersigned finds substantial evidence does not support the ALJ's failure to find Plaintiff had a severe cervical spine impairment.

Having already determined substantial evidence does not support the ALJ's determination at Step Two of the sequential analysis, the undersigned does not address each and every one of Plaintiff's alleged impairments in this regard. According to the Regulations, however, "if a severe impairment exists, all medically determinable impairments must be considered in the remaining steps of the sequential analysis." 20 C.F.R. § 416.923. Besides obesity and cervical impairments, the record indicates Plaintiff was at least diagnosed with COPD, chronic bronchitis, hypertension, high cholesterol, panic disorder, adjustment disorder, a learning disability, and arthritis, none of which were addressed by the ALJ. The undersigned finds the ALJ's failure to at least address these alleged disorders is also reversible error.

Because the ALJ failed to consider several of Plaintiff's severe and medically determinable impairments, the undersigned finds he also failed to consider all of Plaintiff's medically determinable impairments in combination. Such failure to discuss and consider an impairment infects the analysis at the remaining steps. Cook v. Heckler, 783 F.2d 1168 (4th Cir. 1986).

The undersigned therefore also finds substantial evidence does not support: 1) the ALJ's finding at Step Three that Plaintiff did not meet or equal a Listed impairment; 2) his RFC; 3) his hypothetical to the VE; and 4) his ultimate finding that Plaintiff was not disabled.

## E. Medical Opinions

The undersigned also finds the ALJ did not properly evaluate the medical opinions in the record. In particular, Robert Mace, M.D., Plaintiff's long-time treating physician, stated that Plaintiff was diagnosed with chronic back and neck pain, chronic pain due to surgery, pulmonary fibrosis, diabetes, and hypertension. He opined that Plaintiff could not work at the heavy, medium, or light level, but "could be retrained to work with a sedentary job" (R. 526). He could only infrequently perform posturals. It would be advisable or necessary for Plaintiff to recline during the day and have frequent rest periods during the day. He would need to elevate his feet. "Although it is not binding on the Commissioner, a treating physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it." Craig v. Chater, 76 F. 3d 585, 589 (4th Cir. 1996). The treating physician's opinion should be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Mitchell v. Schweiker, 699 F.2d 185 (4th Cir. 1983).

20 C.F.R. § 404.1527 states:

(d) *How we weigh medical opinions*. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion
　　(1) *Examining relationship*. Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

　　(2) *Treatment relationship*. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief

hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight. <u>When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.</u>

> (i) *Length of the treatment relationship and the frequency of examination.* Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion. When the treating source has seen you a umber of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

> (ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.

> (3) *Supportability.* The more a medical source presents relevant evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion. . . .

> (4) *Consistency.* Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(Emphasis added). The ALJ's evaluation of Dr. Mace's opinion is, in *toto*:

> Dr. Robert M. Mace, who specializes in family practice, completed a Residual Functional Capacity Assessment (Exhibit C37F). In the form, the doctor indicated

that he had been treating the claimant from May 1987 to the present. Although Dr. Mace opined the claimant was unable to perform heavy, medium, or light work, the claimant was capable of performing sedentary (office type work). This determination is also on an issue reserved to the Commissioner per SSR 96-5p. To the extent that it does not conflict with the residual functional capacity detailed below, I have given it some weight.

(R. 23). The undersigned finds this analysis of a treating physician opinion insufficient under the regulations.

As regards Plaintiff's alleged mental impairments, the undersigned also finds the ALJ's analysis of psychologist Morgan's opinion is insufficient. Mr. Morgan is an examining psychologist, to whom Plaintiff was referred for evaluation by the State agency (R. 261). Mr. Morgan found Plaintiff's mood was mildly dysphoric and tense; his motor behavior appeared mildly retarded, and he appeared quite tense and rigid at times (R. 261). It appeared he suffered from some type of learning disability, although whether it was within all areas, or just a general level of poor academic functioning was not made clear by the tests. In addition, although Plaintiff's concentration was normal, his persistence was poor and his pace was moderately slow. Mr. Morgan diagnosed panic disorder without agoraphobia, adjustment disorder with depressed mood, and learning disability NOS. He also opined that Plaintiff would have "marked" limitations in his ability to interact appropriately with supervisors and coworkers, respond appropriately to work pressures, and respond appropriately to changes in a routine work setting.

The ALJ discussed Mr. Morgan's report as follows:

On April 5, 2002, a consultative psychological examination of the claimant was performed (Exhibit C16F). Intelligence testing revealed a verbal I.Q. of 96, a performance I.Q. of 86, and a full scale I.Q. of 79,[3] which are above listing-level

---

[3] These findings of fact are incorrect. Plaintiff's IQ was determined to be 82 verbal, 80 performance, and 79 full scale, although these scores are still above Listing-level severity.

severity. The diagnoses included an adjustment disorder with depressed mood. His activities of daily living and social functioning were normal. Although his concentration was normal, his persistence was poor, and his pace was moderately slow. His immediate and recent memory was normal.

(R. 22). The ALJ did not indicate what weight he gave Mr. Morgan's opinion. He found, however, that Plaintiff's only mental impairment was depression. Contrary to Mr. Morgan's report, the ALJ also stated: "there is no evidence to suggest that the claimant has . . . marked difficulties in maintaining concentration, persistence or pace." Also: "In regard to concentration, persistence, and pace, there is nothing to suggest more than at most a moderate limitation. Although his concentration was normal, his persistence was poor, and his pace was moderately slow." The undersigned finds that, without more explanation, the ALJ's treatment of Mr. Morgan's report and Plaintiff's alleged mental impairments as a whole, are insufficient.

The undersigned notes the ALJ did not accord more than "little" or "some" weight to any medical opinion. He accorded the State agency reviewing physicians "no particular weight." This is not to say that any of the opinions were entitled to more weight, but only that the explanation of the weight accorded each is insufficient and the basis for the ALJ's determination of Plaintiff's RFC is unclear.

## F. Credibility

The undersigned additionally finds the ALJ's credibility analysis fails to meet the requirements of Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996). Under Craig, the ALJ must first determine whether the medical evidence shows an impairment that could reasonably be expected to cause the symptoms alleged. Id. at 596. The Fourth Circuit in Craig found the ALJ had properly weighed the opinions of the treating physicians, properly considered Craig's therapist's report, adequately developed the record despite Craig's pro-se status, and properly considered all relevant

evidence in assessing Craig's RFC. Id. at 589-91. Nevertheless, the Court found that the ALJ failed to "expressly consider the threshold question of whether Craig had demonstrated by objective medical evidence an impairment capable of causing the degree and type of pain she alleges." Id. at 596. The Court held that the ALJ must determine whether the objective evidence could reasonably be expected to produce "the actual pain, in the amount and degree, alleged by the claimant." Id. at 594.

Here, ALJ Levine did not make an express finding as to whether Plaintiff suffered an impairment that could reasonably be expected to result in his alleged symptoms. Instead, he "proceeded directly to considering the credibility of [Bankhead's] subjective allegations of pain." Craig, supra, at 596 (R. 19-20). The undersigned has consistently found that the Fourth Circuit in Craig imposed on the ALJ the duty to expressly state whether the objective evidence shows an impairment that could cause the claimant's claimed symptoms at step one of the pain analysis. 76 F.3d at 596. Indeed, the Craig Court held that "the ALJ's consideration of the medical evidence was more than adequate" and he had reviewed all the medical records "in painstaking detail." Id. at 591-592. Nevertheless, the Court found his decision inadequate because he failed to address the threshold question in the pain analysis.

The undersigned similarly finds the ALJ here failed to address the threshold question in his pain analysis, and therefore finds substantial evidence does not support the ALJ's determination that Plaintiff's allegations regarding his work-related limitations were not totally credible. Additionally, as already noted, the ALJ did not consider several of Plaintiff's severe and medically-determinable impairments. The undersigned finds this failure infects both steps of his credibility analysis.

The undersigned notes the ALJ's and the Defendant's comments regarding Plaintiff's

continued smoking despite his doctors' urging him to quit. Indeed, Plaintiff re-started smoking only weeks after his lung surgery, and it was noted he smoked a cigarette only two minutes before PFC testing. The Fourth Circuit has cited cases in which "[f]ailure to quit smoking has been held to be a justifiable grounds for refusing benefits." Gordon v. Schweiker, 725 F.2d 231 (4th Cir. 1984) (citing Henry v. Gardner, 381 F.2d 191 (6th Cir. 1967); Hirst v. Gardner, 365 F.2d 125 (7th Cir. 1966)). The Fourth Circuit, however, stated:

> Smoking, like alcohol abuse, can be an involuntary act for some persons. We believe that allegations of tobacco abuse should be treated in the same fashion as allegations of alcohol abuse. On remand the Secretary should also ascertain the degree and nature of the claimant's cigarette abuse. The Secretary may only deny the claimant benefits because of alcohol or tobacco abuse if she finds that a physician has prescribed that the claimant stop smoking or drinking and the claimant is able voluntarily to stop.

Id. at 236. It is interesting that the Fourth Circuit held that smoking should be treated in the same fashion as alcohol abuse, because, since the date Gordon was decided, the Regulations were amended, so that currently an individual will not be considered disabled if alcoholism would be a contributing factor material to the determination of disability. See 20 C.F.R. § 404.1535. The Fourth Circuit has not yet further addressed the issue of tobacco abuse, however. Under the current state of the law in the Fourth Circuit, therefore, Plaintiff's continued smoking is not dispositive of the issue of whether he is disabled, even by a severe respiratory impairment.

For all the above reasons, the undersigned finds substantial evidence does not support the ALJ's determination that Plaintiff was not under a disability, as defined in the social Security Act, at any time through the date of his decision.

## V. RECOMMENDED DECISION

For the reasons above stated, the undersigned finds the Commissioner's decision denying

Plaintiff's application for SSI is not supported by substantial evidence. I accordingly recommend Defendant's Motion for Summary Judgment [Docket Entry 8] be **DENIED**, and Plaintiff's Motion for Judgment on the Pleadings [Docket Entry 13] be **GRANTED IN PART** by reversing the Commissioner's decision under sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3), with a remand of the cause to the Commissioner for further proceedings consistent and in accord with this Recommendation.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Robert E. Maxwell, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this 24 day of July, 2006.


JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE